**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **SCOTT HINTON**, individually and on behalf of all others similarly situated,<br>% Dann Law<br>15000 Madison Avenue<br>Lakewood, OH 44107<br><br>Plaintiff,<br><br>v.<br><br>**FIGURE LENDING, LLC**<br>% Corporation Service Company, Reg. Agent<br>1160 Dublin Road, Suite 400<br>Columbus, OH 43215<br><br>Defendant. | Case No. 2:26-cv-00418<br><br>Judge<br><br>**CLASS ACTION COMPLAINT WITH JURY DEMAND** |

Plaintiff Scott Hinton, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Figure Lending LLC, and alleges, upon personal knowledge as to Plaintiff's own actions and upon information and belief and Plaintiff's counsel's investigation as to all other matters, as follows:

## INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the personally identifiable information of Plaintiff and other similarly situated individuals, including full names, Social Security numbers, home addresses, dates of birth, phone numbers, email addresses, loan account numbers, and loan information (collectively "PII" or "Private Information").

2. Defendant is a financial technology lending company specializing in blockchain-enabled home equity lines of credit, mortgage refinancing, and crypto-backed loans,

and provides technology and loan administrative services to other lenders and business partners.

3. Upon information and belief, Figure Lending LLC is a wholly-owned subsidiary of Figure Technology Solutions, Inc.[1]

4. As a condition of obtaining Defendant's lending services, Plaintiff and Class Members were required to provide Defendant with their Private Information. By collecting and maintaining that information, Defendant assumed a duty to secure and protect it from unauthorized access through reasonable and adequate data security measures.

5. On or around January 28, 2026, a hacking group using the online moniker "ShinyHunters" infiltrated Defendant's inadequately protected network servers and accessed Plaintiff's and Class Members' highly sensitive PII that was being stored there (the "Data Breach").[2]

6. The Data Breach resulted from a social engineering attack in which a Defendant's employee was tricked into providing access, allowing the hackers to steal customer data.[3]

7. ShinyHunters later posted on its dark web data leak website, stating that Defendant refused to pay a ransom, and published approximately 2.5 gigabytes of stolen data, which on information and belief, included Plaintiff's and Class Members' PII.[4]

8. On or around February 13, 2026, reports began surfacing on the internet that Defendant had been the subject of the ShinyHunters attack, with the group issuing a final warning:

> Over 100k+ records containing PII and other internal corporate data have been compromised. This is a final warning to reach out by 18 Feb 2026 before we leak along with several annoying (digital) problems that'll come

[1] https://www.figure.com/privacy/ (last visited April 3, 2026)
[2] https://www.mass.gov/doc/2026-267-figure-technology-solutions-inc/download (last visited April 3, 2026)
[3] https://www.prnewswire.com/news-releases/privacy-alert-figure-lending-corp-under-investigation-for-data-breach-of-nearly-1-million-user-records-302713173.html (last visited April 3, 2026)
[4] https://techcrunch.com/2026/02/13/fintech-lending-giant-figure-confirms-data-breach/ (last visited April 3, 2026)

your way. Make the right decision, don't be the next headline.[5]

9. The Data Breach impacted approximately 967,200 accounts.[6] On or about February 24, 2026, Defendant began notifying affected individuals — six days after ShinyHunters' public deadline had already passed and weeks after the stolen data had been circulating on criminal marketplaces. The notices Defendant sent omitted the material facts that a ransom had been demanded and Defendant refused, that the stolen data had already been published on the dark web, and that ShinyHunters had issued a public deadline before a single affected individual was notified.

10. The Data Breach was the foreseeable result of Defendant's systemic security failures. Despite being a Nasdaq-listed financial institution subject to the Gramm-Leach-Bliley Act and the FTC Safeguards Rule, Defendant stored the unencrypted Private Information of nearly one million consumers in an Internet-accessible environment, failed to implement adequate authentication controls, failed to secure its Okta single sign-on implementation against a known attack vector, and failed to train employees to recognize and resist social engineering attacks.

11. Defendant's conduct has injured Plaintiff and Class Members through invasion of privacy and theft of PII; the lost or diminished value of their PII; costs and lost time associated with mitigating the consequences of the breach; lost benefit of their bargain; emotional distress; and a substantial and ongoing risk of identity theft and financial fraud that, given the categories of data compromised, may persist for years or decades.

12. Plaintiff seeks remedies including compensatory damages, reimbursement of out-of-pocket costs, disgorgement, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other relief this Court deems proper.

---

[5] https://techcrunch.com/2026/02/13/fintech-lending-giant-figure-confirms-data-breach/ (last visited April 3, 2026)

[6] See note 2, *supra*.

## PARTIES, JURISDICTION, AND VENUE

13. Plaintiff Scott Hinton is a citizen and resident of the State of Ohio.

14. Defendant Figure Lending LLC is a Delaware limited liability company headquartered at 650 S. Tryon Street, 8th Floor, Charlotte, North Carolina 28202, and is a wholly-owned subsidiary of Figure Technology Solutions, Inc. Defendant has been registered to conduct business in Ohio as a foreign for-profit limited liability company since February 2, 2018, and has registered the trade name "Figure" in Ohio for the origination of first-lien and subordinate-lien residential mortgage loans and home equity lines of credit, which it actively offers to Ohio consumers.

15. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs, the proposed Class consists of more than 100 members, and minimal diversity exists because Defendant is a citizen of Delaware and North Carolina while Plaintiff, and at least one other Class Member, is a citizen of Ohio.

16. This Court has personal jurisdiction over Defendant because it is registered to conduct business in Ohio, maintains a statutory agent in this District, and collected and stored the PII of Plaintiff and Class Members in connection with its lending operations here.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred here.

## GENERAL FACTUAL ALLEGATIONS

### Defendant's Business Practices

18. Defendant bills itself as a technology-driven lender specializing in blockchain-enabled home equity lines of credit and refinancing, and crypto-backed loans.

Defendant also provides technology and loan administrative services to other lenders and business partners.[7]

19. Defendant is not a nascent startup but a mature, publicly traded financial technology company listed on the Nasdaq Stock Market under the ticker symbol "FIGR." Defendant has unlocked over $22 billion in equity for homeowners and maintains more than 250 business-to-business partners, including banks, credit unions, fintechs, and home improvement companies. Defendant commands a 75% market share in real-world asset tokenization, issued the first SEC-approved interest-bearing stablecoin, and has had its HELOC securitizations rated AAA by both S&P and Moody's, with Goldman Sachs, J.P. Morgan, Barclays, and Jefferies serving as lead underwriters. In 2025 alone, Defendant received recognition from Forbes as one of the 50 Most Innovative Fintech Startups, from Fast Company as one of the Most Innovative Companies in Finance, and from Investopedia and Money.com as the Best Overall HELOC. Defendant has publicly touted AI-powered loan approvals in under five minutes and processing cost reductions of 20x — all while storing the unencrypted personally identifiable information of nearly one million consumers in an Internet-accessible environment.[8]

20. As part of its operations, Defendant collects, maintains, and stores borrowers' and prospective borrowers' highly sensitive personally identifiable information, including financial information.

21. Plaintiff and Class Members are applicants or borrowers of home equity lines of credit and other lending products from Defendant. Plaintiff and Class Members directly or indirectly entrusted Defendant with their PII.

---

[7] See note 2, *supra.*
[8] https://www.figure.com/about/ (last visited April 3, 2026).

22. Plaintiff and Class Members value their privacy and have taken reasonable steps to maintain the confidentiality of their PII.

23. Plaintiff and Class Members reasonably expected that Defendant would keep their sensitive Private Information confidential and securely maintained, use their information for necessary purposes only, and make only authorized disclosures of their information.

**The Data Breach**

24. The Data Breach resulted from a social engineering attack in which a Figure employee was tricked into providing access to Defendant's systems.[9] A member of ShinyHunters subsequently told TechCrunch that Figure was among the victims of a coordinated campaign targeting organizations that rely on the single sign-on provider Okta.[10]

25. Once inside, the attackers conducted systematic, unauthorized queries against Defendant's loan and loan inquiry databases, extracting the highly sensitive financial and personal records of approximately 967,200 individuals — records that Defendant had collected as a condition of providing its lending services and had promised to protect.[11] The systematic nature of these queries reflects that the attackers had sufficient and sustained access to Defendant's systems to conduct targeted database operations, a fact that itself speaks to Defendant's failure to monitor and detect unauthorized activity in real time.

26. A member of ShinyHunters told TechCrunch that Figure was among the victims of a coordinated hacking campaign targeting customers who rely on the single sign-on provider Okta. Other victims of the campaign included Harvard University and the University of Pennsylvania.[12] The fact that Figure was among a wave of targets in a coordinated campaign

---

[9] See note 3, *supra.*
[10] See note 4, *supra.*
[11] See note 2, *supra.*
[12] See note 4, *supra.*

against Okta customers underscores that this was not an unforeseeable or novel attack vector. ShinyHunters' campaign against Okta-reliant organizations was publicly reported in the cybersecurity community, and Defendant, as a Nasdaq-listed financial institution storing the records of nearly one million consumers, had both the means and the obligation to monitor such threat intelligence and harden its Okta implementation accordingly.

27. ShinyHunters demanded a ransom from Defendant in exchange for the return of the stolen PII.[13] Defendant refused to pay.[14] Rather than promptly notify affected individuals so they could take protective measures, Defendant remained silent while ShinyHunters published approximately 2.5 gigabytes of stolen PII, including that of Plaintiff and Class Members, on the dark web.[15] On or about February 13, 2026, ShinyHunters issued a public warning giving Defendant until February 18, 2026 to make contact or face further consequences:

> Over 100k+ records containing PII and other internal corporate data have been compromised. This is a final warning to reach out by 18 Feb 2026 before we leak along with several annoying (digital) problems that'll come your way. Make the right decision, don't be the next headline.[16]

28. Defendant did not notify Plaintiff and Class Members until February 24, 2026 — six days after that deadline had already passed, and weeks after the stolen data had already been circulating on criminal marketplaces.

29. TechCrunch reviewed a portion of the published data, confirming that it included Defendant's customers' full names, home addresses, dates of birth, and phone numbers.[17] Notably, while TechCrunch was able to confirm these categories from the published data, Defendant's own subsequent notification to affected individuals confirmed that Social Security

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] See note 4, *supra.*

numbers, loan account numbers, and loan information were also among the compromised categories — data far more damaging than the information TechCrunch reviewed, and data that, unlike a credit card number, cannot be cancelled, reissued, or otherwise neutralized once exposed.[18]

30. On or about February 24, 2026, Defendant began sending notification letters to affected individuals.

31. In those notices, Defendant informed Plaintiff and Class Members:

> Figure Lending Corp and its subsidiaries, Figure Lending LLC, Figure Markets Credit LLC, and Figure Payments Corporation (collectively, 'We' or 'Figure') are writing to let you know about a security incident that affected your personal information. ... Recently, Figure discovered unauthorized activity on our systems. We acted quickly to stop the activity and enhance our security measures, and we began working with a leading cybersecurity firm to investigate what happened. We also reported the incident to law enforcement and offered our full cooperation. However, we did identify evidence that on January 28, 2026 data containing personal information was obtained through queries on company databases that store loan and loan inquiry data.[19]

32. Defendant admitted in the Notice of Data Breach that the compromised data includes: full names, Social Security numbers, addresses, phone numbers, emails, dates of birth, loan account numbers, and loan information.[20]

33. Critically, the notices Defendant sent to Plaintiff, Class Members, and the Attorneys General deliberately omitted material facts that affected individuals needed to protect themselves. Specifically, Defendant failed to disclose: (i) that ShinyHunters had demanded a ransom and that Defendant had refused to pay; (ii) that the stolen PII had already been published on the dark web prior to the notice being sent; and (iii) that ShinyHunters had issued a public deadline of February 18, 2026, six days before Defendant's notification, after which it warned

---

[18] See note 2, *supra.*
[19] See note 2, *supra.*
[20] *Id.*

that further consequences would follow.[21] By omitting these facts, Defendant denied Plaintiff and Class Members the opportunity to understand the full scope of the threat they faced and the urgency with which they needed to act.

34. Although the Data Breach occurred on January 28, 2026, and the PII of Plaintiff and Class Members was posted to the dark web within days of the breach, Defendant inexcusably failed to notify Plaintiff and Class Members until beginning in late February and early March 2026. This delay was not merely a procedural failure, it was materially harmful. During the period between the Data Breach and Defendant's delayed notification, ShinyHunters published the stolen data, issued a public ransom deadline, and allowed the PII of Plaintiff and Class Members to circulate on criminal marketplaces. Each day of delay was a day Plaintiff and Class Members could not freeze their credit, place fraud alerts, or take other protective measures. Defendant's silence during this window directly compounded the harm its inadequate security had already caused.

35. In response to the Data Breach, Defendant claims that "we have implemented enhanced security and monitoring controls."[22] However, Defendant has offered neither Plaintiff and Class Members nor the public a meaningful account of what went wrong, what specific vulnerabilities were exploited, or what concrete measures have been implemented to prevent a recurrence. The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their information remains protected. This stands in stark contrast to Defendant's obligations as a publicly traded company and as a

---

[21] See note 4, *supra*
[22] See note 2, *supra*

financial institution subject to regulatory oversight, both of which demand transparency about material security incidents.

36. Defendant has offered Plaintiff and Class Members two years of credit monitoring and identity restoration services through TransUnion, which Plaintiff and Class Members must enroll in by May 31, 2026.[23] This offer is facially inadequate for a breach involving Social Security numbers, dates of birth, and loan account information — data that cannot be changed and that enables identity fraud for a lifetime.

37. The Government Accountability Office has documented that stolen PII may be held for over a year before use, meaning the two-year monitoring window may expire before the harm even begins to materialize.[24] Moreover, by requiring Plaintiff and Class Members to affirmatively enroll by a fixed deadline, Defendant has placed the administrative burden of self-protection on the very people it harmed, many of whom may never receive or act on the enrollment notice in time. The offered service is wholly inadequate to protect Plaintiff and Class Members from the threats they face for years, and likely decades, to come.

**Defendant's Privacy Representations**

38. Prior to and through January 28, 2026, Defendant published a Privacy Policy on its website applicable to PII collected from Plaintiff and Class Members.[25] The Privacy Policy was last revised on October 24, 2025, just three months before the Data Breach occurred, meaning these representations were not stale boilerplate but active, deliberate, and recently reaffirmed commitments to consumers whose data Defendant was storing at the time of the breach.

[23] *Id.*
[24] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited April 3, 2026)
[25] See note 1, *supra*

39. In its Privacy Policy, under a section titled "Security," Defendant expressly and unequivocally represented: "We use reasonable precautions, including technical and administrative measures, to protect your Personal Data from loss, misuse, and unauthorized access, disclosure, alteration, or destruction."[26] This representation was made to every consumer who provided PII to Defendant, including Plaintiff and Class Members, as a material inducement to entrust Defendant with their most sensitive personal and financial information.

40. The weight of this promise is underscored by the extraordinary breadth and sensitivity of the PII that Defendant's own Privacy Policy acknowledges collecting. Specifically, Defendant's Privacy Policy discloses that it collects and maintains, among other categories: full names, postal addresses, email addresses, Social Security numbers, taxpayer identification numbers, driver's license numbers, passport numbers, dates of birth, copies of government-issued identification documents, biometric information including facial geometry, income information, bank account and routing numbers, transaction information, and financial institution login credentials, including the usernames and passwords consumers use to access their own bank accounts.[27] That Defendant would collect data of this extraordinary sensitivity while failing to implement the security measures it promised to protect it makes its representations all the more egregious.

41. Defendant's Privacy Policy further represented, under "How We Use Personal Data," that one of the express purposes for which Defendant collects and maintains consumer PII is: "To detect, prevent, and address fraud, criminal activity, or misuses of our Services and to ensure the security of our IT systems, architecture and networks."[28] Defendant thus not only promised reasonable precautions to protect consumer data, it promised to affirmatively use that

[26] *Id.*
[27] *Id.*
[28] *Id.*

data to ensure the security of its own systems. The Data Breach demonstrates that Defendant failed on both counts.

42. Defendant further represented in its Privacy Policy: "We want to be clear that we do not sell your Personal Data to any other entities."[29] While Defendant may not have sold the data voluntarily, its failure to implement adequate security measures resulted in the functional equivalent — the mass, uncompensated transfer of Plaintiff's and Class Members' most sensitive PII to criminal actors who published it on the dark web for anyone to access, exploit, and monetize.

43. Defendant is a financial institution under the Gramm-Leach-Bliley Act ("GLBA") and is subject to GLBA-related obligations, including the Safeguards Rule's requirement for a written information security program with reasonable administrative, technical, and physical safeguards.[30] Defendant's own Privacy Policy expressly acknowledges this obligation, directing consumers to review its separate GLBA Privacy Notice — a recognition that Defendant understood and publicly accepted its legal duties under federal law to protect the financial information of its customers.[31]

44. Despite these public-facing privacy representations, Defendant's express acknowledgment of its GLBA obligations, and the extraordinary sensitivity of the PII it collected and stored, the Data Breach reveals that Defendant catastrophically failed to implement and maintain data security measures consistent with its promises and applicable legal requirements. The gap between what Defendant promised its customers and what it actually delivered could not be more stark: while consumers were assured of reasonable precautions and system security, Defendant was storing their unencrypted PII, including Social Security numbers, bank

[29] *Id.*
[30] *Id.*
[31] https://www.figure.com/glba-privacy-notice.pdf (last visited April 3, 2026)

credentials, and biometric data, in an Internet-accessible environment, with inadequately trained employees and insufficient controls to detect or prevent the precise type of attack that ultimately occurred.

**Data Breaches Are Preventable Through Reasonable Security Measures**

45. Data breaches of the type suffered by Defendant are preventable through the implementation of well-established, legally mandated security measures. Federal law, regulatory guidance, and industry standards have long required financial institutions like Defendant to implement specific, concrete safeguards to protect consumer PII from precisely the type of attack that occurred here.

46. As a financial institution subject to the Gramm-Leach-Bliley Act ("GLBA") and the FTC's Standards for Safeguarding Customer Information, 16 CFR Part 314 (the "Safeguards Rule"), Defendant was legally required to develop, implement, and maintain a comprehensive, written information security program containing administrative, technical, and physical safeguards appropriate to the nature and scope of its activities and the sensitivity of the customer information it maintained.[32]

47. The Safeguards Rule imposed specific, mandatory obligations on Defendant that, had they been followed, would have prevented or materially mitigated the Data Breach. Among other requirements, Defendant was legally obligated to:

a. Conduct and document a written risk assessment identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and periodically reassess those risks;[33]

---

[32] 16 C.F.R. § 314.3(a).
[33] 16 C.F.R. § 314.4(b).

b. Implement and periodically review access controls—including technical and physical controls—to authenticate and permit access only to authorized users, and to limit authorized users' access to only the customer information necessary to perform their duties;[34]

c. Protect by encryption all customer information held or transmitted by Defendant, both in transit over external networks and at rest;[35]

d. Implement multi-factor authentication for any individual accessing any information system;[36]

e. Develop, implement, and maintain procedures for the secure disposal of customer information no later than two years after the last date the information is used in connection with the provision of a product or service, and periodically review data retention policies to minimize unnecessary retention of data;[37]

f. Implement policies, procedures, and controls designed to monitor and log the activity of authorized users and detect unauthorized access or use of customer information;[38]

g. Regularly test or otherwise monitor the effectiveness of safeguards' key controls, systems, and procedures, including through continuous monitoring or periodic penetration testing and vulnerability assessments conducted at least every six months;[39]

---

[34] 16 C.F.R. § 314.4(c)(1).
[35] 16 C.F.R. § 314.4(c)(3).
[36] 16 C.F.R. § 314.4(c)(5).
[37] 16 CFR § 314.4(c)(6)
[38] 16 CFR § 314.4(c)(8)
[39] 16 CFR § 314.4(d)

h. Provide personnel with security awareness training, including training updated as necessary to reflect risks identified in the risk assessment—such as risks posed by social engineering attacks;[40]

i. Establish a written incident response plan designed to promptly respond to, and recover from, any security event materially affecting the confidentiality, integrity, or availability of customer information, addressing internal processes, roles and responsibilities, communication protocols, and documentation requirements;[41] and

j. Notify the FTC of any notification event involving the information of 500 or more consumers as soon as possible, and no later than 30 days after discovery of the event.[42]

48. Beyond its mandatory legal obligations, Defendant was also on notice of additional, widely published cybersecurity guidance from the FTC, the National Institute of Standards and Technology ("NIST"), the SANS Institute, and the Center for Internet Security ("CIS")—all of which have long recommended baseline security practices directly applicable to the vulnerabilities exploited in this breach. These recommendations include: identifying all connections to systems where sensitive information is stored; assessing the vulnerability of each connection to known or reasonably foreseeable attacks; using firewalls and monitoring tools to protect against and detect intrusions; implementing role-based access controls; requiring complex, unique credentials; monitoring network traffic for signs of a breach; and verifying that third-party service providers, such as single sign-on providers, have implemented reasonable security measures of their own.

[40] 16 CFR § 314.4(e)(1)
[41] 16 CFR § 314.4(h)
[42] 16 C.F.R. § 314.4(j)

49. The FTC has repeatedly brought enforcement actions against companies whose failure to implement these baseline security measures constituted an unfair act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. The FTC's consistent enforcement posture has placed all financial institutions, including Defendant, on clear notice that failing to employ reasonable and appropriate data security measures is not merely a best practice, but a legal obligation.

50. Defendant failed to implement these well-established, legally mandated safeguards. Upon information and belief, Defendant: (a) failed to encrypt customer PII at rest, in direct violation of 16 C.F.R. § 314.4(c)(3); (b) failed to implement adequate multi-factor authentication controls sufficient to prevent a social engineering attack from granting unauthorized access to its systems, in violation of 16 C.F.R. § 314.4(c)(5); (c) failed to adequately train employees to recognize and resist social engineering attacks, in violation of 16 C.F.R. § 314.4(e)(1); (d) failed to implement adequate access controls to limit employee access to sensitive customer databases, in violation of 16 C.F.R. § 314.4(c)(1); (e) failed to adequately monitor and log system activity to detect unauthorized access in real time, in violation of 16 C.F.R. § 314.4(c)(8); (f) stored customer PII well beyond the period necessary for its business purposes without adequate disposal procedures, in violation of 16 C.F.R. § 314.4(c)(6); and (g) failed to notify the FTC within 30 days of discovery of the Data Breach as required by 16 C.F.R. § 314.4(j). Defendant's failures were not the result of unforeseeable circumstances—they were the predictable consequence of a company that collected and stored the sensitive financial information of nearly one million consumers while cutting corners on the very security measures the law required it to maintain.

**Defendant Knew or Should Have Known of Its Susceptibility to Cyber Attacks**

51. Defendant knew or should have known that its computer systems were a prime target for cyberattacks. Warnings about the escalating threat to financial institutions, including warnings from federal agencies, North Carolina state officials, and industry sources, were readily available, widely publicized, and directly applicable to Defendant's operations well before the Data Breach occurred.

52. Defendant's principal place of business is in Charlotte, North Carolina. As a North Carolina-headquartered financial technology company storing the sensitive financial data of nearly one million consumers, Defendant operated in a state where cybersecurity threats to businesses and financial institutions had been publicly and repeatedly flagged by state leadership as an immediate and growing danger.

53. In March 2026, just weeks after the Data Breach occurred, North Carolina Governor Josh Stein and the North Carolina Department of Information Technology ("NCDIT") issued a formal public warning urging businesses throughout the state to immediately strengthen their cybersecurity defenses.[43] NCDIT specifically warned that nation-state actors and hostile foreign governments were actively targeting U.S. organizations, including financial institutions.[44] North Carolina's Chief Information Security Officer, Bernice Russell-Bond, stated publicly that cyberthreats are "no longer distant concerns" but "immediate realities," and that the consequences of attacks—including ransomware directed at critical infrastructure—"can directly impact public safety and economic stability."[45] These warnings reflected a threat landscape that had been building for years, one that Defendant, as a prominent North Carolina-based financial institution, was duty-bound to monitor and respond to.

---

[43] https://it.nc.gov/news/press-releases/2026/03/16/governor-stein-and-ncdit-urge-enhanced-cybersecurity-measures-amid-increased-global-threats (last visited April 3, 2026)
[44] *Id.*
[45] *Id.*

54. The threat environment facing North Carolina businesses was not abstract or speculative. Reporting by WRAL News documented a wave of cyberattacks striking North Carolina businesses, municipalities, and organizations, noting that phishing-based intrusions—precisely the type of social engineering attack that compromised Defendant's systems—had surged dramatically in North Carolina, with losses from such attacks rising from approximately $25 million in 2019 to nearly $70 million in the years immediately preceding the Data Breach.[46] Cybersecurity professionals quoted in that reporting specifically identified the failure to implement multi-factor authentication as a critical and preventable vulnerability.

55. In October 2019, the Federal Bureau of Investigation published a warning titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations," explicitly alerting businesses to the growing ransomware threat.[47] By April 2020, ransomware was being referenced in over 1,000 SEC filings, signaling its ubiquity as a recognized corporate risk. In 2023 alone, there were 6,077 recorded data breaches exposing more than 17 billion records—a 19.8% year-over-year increase in the United States.[48] Identity theft complaints nearly doubled over a four-year span, from 2.9 million reports in 2017 to 5.7 million in 2021.[49]

56. ShinyHunters—the very group that attacked Defendant—was not an unknown or novel threat actor. The group had a well-documented history of high-profile attacks against major organizations and was widely reported in the cybersecurity community as among the most active and dangerous threat groups targeting companies that rely on single sign-on providers like

---

[46] https://www.wral.com/video/cyber-attacks-expose-sensitive-information-for-nc-businesses-towns/21522241/ (last visited April 3, 2026)
[47] FBI, "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" (Oct. 2, 2019), available at https://www.ic3.gov/Media/Y2019/PSA191002 (last visited April 3, 2026)
[48] Flashpoint, 2024 Global Threat Intelligence Report (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download (last visited April 3, 2026)
[49] Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited April 3, 2026)

Okta.[50] Defendant had both the means and the obligation to monitor threat intelligence about active cybercriminal groups and to take protective measures accordingly.

57. Despite all of these warnings, Defendant stored the unencrypted PII of nearly one million consumers in an Internet-accessible environment, failed to adequately secure its Okta single sign-on implementation, and failed to train employees to recognize and resist social engineering attacks. Defendant's susceptibility to the Data Breach was not the product of unforeseeable circumstances. It was the predictable result of a company that ignored the mounting and unmistakable warnings directed squarely at businesses like itself, operating in its own state, in its own industry.

**The Value of Personally Identifiable Information**

58. The PII compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

59. Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[51] This valuation is borne out by dark web market research: while stolen credit card details sell for as little as $10 to $240[52], a complete package of documents and account details enabling full identity theft commands upwards of

---

[50] https://cybersecurity.fullcoll.edu/2025/10/07/shinyhunters-wage-broad-corporate-extortion-spree/; see also, note 5, *supra*

[51] Tim Greene, "="Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers," IT World (Feb. 6, 2015), available at https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited April 3, 2026)

[52] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited April 3, 2026)

$1,010 to $1,170[53], reflecting the outsized and lasting harm that compromised PII inflicts on its victims compared to financial account credentials alone.

60. Unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

61. The dark web marketplace reflects this reality: while a stolen payment card can be replaced at minimal cost to the victim, a U.S. passport sells for approximately $50 and a driver's license for approximately $150 on dark web marketplaces—documents that are far more difficult to invalidate and replace, and whose compromise enables a broader and more sustained pattern of fraud.[54] Bank account credentials, which can enable direct financial theft, sell for between $30 and $4,255 depending on account value, underscoring the severity of financial exposure when PII is used to access or establish accounts.[55]

62. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police. The dark web marketplace for stolen personal data is vast and actively exploited: researchers at cybersecurity firm Privacy Affairs found over 9,000 vendors selling fake IDs and credit cards, with the volume of stolen personal information sold in 2022 exceeding that of the prior year, including 4.5 million credit cards listed for sale in August 2022 alone.[56] As Privacy Affairs CEO

---

[53] https://njbia.org/study-your-identity-is-worth-1170-on-dark-web/ (last visited April 3, 2026)
[54] See note 40, *supra*
[55] *Id.*
[56] See note 41, *supra*

Miklos Zoltan warned, the sheer volume and low cost of stolen data on the dark web means that victims face threats from numerous bad actors simultaneously, not just a single opportunistic fraudster.[57]

63. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[58] This prolonged exposure window makes the harm from a PII breach categorically different from, and more severe than, a credit card breach, where re-issuance of a card can interrupt the fraud cycle within days.

**Defendant Breached Its Duty to Protect Plaintiff's and Class Members' Private Information**

64. Defendant was at all times fully aware of its obligations to protect the PII of its customers. As a Nasdaq-listed financial technology company, the number one non-bank HELOC lender in the United States, and a financial institution subject to the GLBA and the FTC Safeguards Rule, Defendant operated in a heavily regulated industry where data security obligations are not aspirational guidelines but legally mandated requirements.[59] Defendant's own Privacy Policy expressly acknowledged these obligations and made affirmative promises to

---

[57] *Id.*

[58] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited April 3, 2026)

[59] See note 9, *supra*

consumers about the security measures in place to protect their data.[60] Defendant cannot credibly claim ignorance of its duties.

65. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring. Upon information and belief, and as detailed in the preceding paragraphs, Defendant's failures were not isolated or accidental — they were systemic. Defendant: (a) stored the PII of nearly one million consumers unencrypted in an Internet-accessible environment, in direct violation of both its own Privacy Policy representations and 16 C.F.R. § 314.4(c)(3); (b) failed to implement adequate multi-factor authentication controls sufficient to prevent a social engineering attack from granting unauthorized access to its systems, in violation of 16 C.F.R. § 314.4(c)(5); (c) failed to adequately train employees to recognize and resist social engineering attacks of precisely the type that ShinyHunters employed, in violation of 16 C.F.R. § 314.4(e)(1); (d) failed to implement adequate access controls to limit employee access to sensitive customer databases, in violation of 16 C.F.R. § 314.4(c)(1); (e) failed to adequately monitor and log system activity sufficient to detect unauthorized access in real time, in violation of 16 C.F.R. § 314.4(c)(8); (f) stored customer PII well beyond the period necessary for its business purposes without adequate disposal procedures, in violation of 16 C.F.R. § 314.4(c)(6); and (g) failed to adequately secure its Okta single sign-on implementation against a known and publicly reported attack vector that had been used against other organizations in the same coordinated campaign.

66. The magnitude of Defendant's breach of duty is underscored by the sensitivity of the data it failed to protect. Defendant's own Privacy Policy discloses that it collects and maintains, among other categories, Social Security numbers, taxpayer identification numbers, government-issued identification documents, biometric information including facial geometry,

[60] See note 1, *supra*

bank account and routing numbers, and financial institution login credentials.[61] This is not ordinary consumer data, it is among the most sensitive categories of personal information in existence, data that cannot be cancelled, reissued, or otherwise neutralized once compromised. Defendant's decision to store this data without adequate security protections was not a reasonable business judgment, it was a foreseeable and preventable failure.

67. Defendant has not issued a detailed explanation of the scope, nature, or potential consequences of the compromise. Despite its obligations as a publicly traded company and as a financial institution subject to regulatory oversight, both of which demand transparency about material security incidents, Defendant has offered only a generalized assurance that it has "implemented enhanced security and monitoring controls."[62] Defendant has shared neither the root cause of the breach, nor the specific vulnerabilities exploited, nor the concrete remedial measures undertaken, with regulators, Plaintiff, or Class Members.

68. Plaintiff and Class Members remain in the dark regarding critical facts they need to protect themselves: what data was stolen in its entirety, how it is being used, who currently possesses it, what specific malware or techniques were employed beyond the initial social engineering attack, and what steps beyond vague assurances are being taken to secure their PII going forward. Defendant's notification letters, sent beginning February 24, 2026, omitted the facts that a ransom had been demanded and refused, that the stolen data had already been published on the dark web, and that ShinyHunters had issued a public warning with a specific deadline before Defendant notified a single affected consumer. Plaintiff and Class Members were thus denied even the opportunity to respond to the threat on the same timeline as the public.

[61] See note 1, *supra.*
[62] See note 2, *supra.*

69. The harm flowing from Defendant's breach of duty is not speculative or future — it is present and ongoing. The PII of Plaintiff and Class Members has already been published on criminal marketplaces. As the Government Accountability Office has documented, stolen PII may be held for over a year before use, and once posted on the web, fraudulent use may continue for years thereafter.[63] Social Security numbers, dates of birth, and financial account information enable identity fraud that can persist for a lifetime and cannot be remediated by the two years of credit monitoring Defendant has offered. Plaintiff and Class Members will bear the consequences of Defendant's failures long after Defendant's obligations under its own remediation offer have expired.

**Plaintiff's and Class Members' Damages**

70. The ramifications of Defendant's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

71. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain heightened protective measures for years, and possibly their entire lives, as a result of Defendant's conduct.

72. Plaintiff and Class Members now face a lifetime risk of (i) identity theft, which is heightened by the loss of Social Security numbers, and (ii) the sharing and detrimental use of their sensitive information.

73. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which the Data Breach showed are susceptible to compromise

---

[63] See note 25, *supra.*

and attack and are subject to further attack so long as Defendant fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

74. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

75. Furthermore, Defendant has offered only a limited period of complimentary credit monitoring, which is wholly inadequate given that victims of data breaches face a substantial and ongoing risk of identity theft and fraud for years following the compromise of their sensitive information.

76. Moreover, Defendant's credit monitoring offer squarely places the burden on Plaintiff and Class Members, rather than on Defendant, to monitor and report suspicious activities to law enforcement.

**Facts Relevant to Plaintiff Scott Hinton**

77. Plaintiff Scott Hinton is a citizen and resident of the State of Ohio.

78. Plaintiff obtained a home equity line of credit from Defendant through West Capital Lending, a mortgage brokerage and direct lender specializing in residential mortgage loans that served as the originating broker for Plaintiff's Figure HELOC. As a condition of obtaining that loan, Plaintiff provided his Private Information directly to Defendant, making him a Figure customer whose data Defendant collected, maintained, and was legally obligated to protect.

79. Despite Defendant's representations in its Privacy Policy that it uses "reasonable precautions, including technical and administrative measures, to protect your Personal Data," and despite Defendant's subsequent claim that it began notifying affected individuals of the Data

Breach on or about February 24, 2026, Plaintiff never received any notification from Defendant that his Private Information had been compromised. Defendant — which had a direct lending relationship with Plaintiff, possessed his contact information as a condition of that relationship, and was legally required under the FTC Safeguards Rule to notify affected individuals promptly — nonetheless failed to provide Plaintiff with any notice of the breach whatsoever. This failure raises serious questions about the adequacy, completeness, and reach of Defendant's notification process, and whether Defendant's notification efforts were as comprehensive as it has represented to regulators and the public.

80. Plaintiff learned of the Data Breach not from Defendant, but from IDnotify, a third-party service powered by Experian to which Plaintiff independently subscribes. Plaintiff received an alert from IDnotify notifying him that his Private Information had been located on the dark web, and identifying figure.com as the potential source of the breach. The fact that a third-party service identified and alerted Plaintiff to the compromise of his data and not Defendant's own notification processes is a direct illustration of the inadequacy of Defendant's response to the Data Breach.

81. The IDnotify alert constitutes concrete, documented evidence that Plaintiff's Private Information was in fact published on the dark web as a result of the Data Breach, and that it has been exposed to criminal actors who traffic in stolen personal data. Plaintiff's Private Information has already been identified in active criminal marketplaces. This is not a risk of future harm. It is present, documented harm.

82. Since learning of the Data Breach, Plaintiff has experienced a marked and noticeable increase in unsolicited spam calls, including calls identified by his phone carrier as "Potential Fraud." This increase in fraudulent contact attempts is consistent with the publication

of Plaintiff's Private Information, and potentially other PII, on dark web criminal marketplaces, where stolen contact information is routinely acquired and used by bad actors for phishing, fraud, and identity theft schemes. This is not a coincidence, it is a direct and foreseeable consequence of Defendant's failure to protect Plaintiff's Private Information, and it is ongoing.

83. Plaintiff is very careful about the privacy and security of his Private Information. Plaintiff protects his Private Information by, among other things, keeping sensitive documents in a safe and secure location, choosing unique usernames and passwords for his various online accounts, and subscribing to identity theft monitoring services precisely to guard against unauthorized exposure of his data. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

84. Plaintiff suffered an invasion of privacy when his Private Information was exposed and then published on criminal marketplaces by ShinyHunters as a result of the Data Breach. Plaintiff provided his PII to Defendant for the limited purpose of obtaining a home equity line of credit — not to have it stored unencrypted in an Internet-accessible environment, and not to have it published on the dark web for criminal actors to exploit.

85. As a result of the Data Breach, Plaintiff has spent, and will continue to spend, significant time and effort monitoring his accounts and responding to alerts to protect himself from identity theft and other harms. The IDnotify alert he received was not the end of that process but the beginning of it, requiring Plaintiff to investigate the scope of the exposure, assess the extent of the Private Information that was compromised, and take additional protective measures accordingly.

86. Plaintiff has lost time attempting to mitigate the fallout of the Data Breach. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and recreation.

87. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information when it was stolen by the hackers and published on the dark web. Private Information is a form of intangible property, property that Defendant, as Plaintiff's lender of record, was required to adequately protect.

88. As a direct customer of Defendant, Plaintiff suffered actual injury and lost the benefit of the bargain because he provided his Private Information to Defendant with the reasonable and mutual expectation that Defendant would implement and maintain reasonable data security practices consistent with its Privacy Policy representations, its legal obligations under the GLBA and FTC Safeguards Rule, and basic industry standards. Had Defendant been transparent about its deficient data security practices, Plaintiff would not have entrusted Defendant with his PII.

89. Because of the Data Breach, Plaintiff suffers from the imminent and impending injury of the substantially increased risk of misuse, fraud, and identity theft, a risk that has already begun to materialize, as evidenced by the appearance of his Private Information on the dark web with figure.com identified as the source.

90. Defendant deprived Plaintiff of the earliest opportunity to guard against the Data Breach's harmful effects by failing to promptly and adequately notify him of it, despite having his direct contact information as his lender of record, despite its legal obligations to provide timely notification, and despite the fact that the stolen data had already been published on criminal marketplaces weeks before Defendant began its notification process. Defendant

apparently failed to notify Plaintiff at all, leaving him to discover the compromise of his data through a third-party monitoring service while Defendant remained silent.

91. Plaintiff has a continuing interest in ensuring that his Private Information, which, on information and belief, remains within the custody or control of Defendant, is protected and safeguarded from additional breaches or cybersecurity risks.

92. For the rest of his life, Plaintiff will have to worry about when and how his sensitive information may be shared or used to his detriment. The appearance of Plaintiff's Private Information on the dark web is not an isolated incident. It is the first documented manifestation of a harm that, given the full categories of PII compromised in this breach, including Social Security numbers, dates of birth, and loan account information, may recur in far more serious forms for years to come.

93. As a result of the Data Breach, Plaintiff spent time dealing with its consequences, including time spent investigating and responding to the IDnotify alert, verifying the legitimacy and scope of the breach, and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

94. Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

95. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and criminals — a risk that is no longer theoretical but documented.

## CLASS ALLEGATIONS

96. Plaintiff brings this action pursuant to the provisions of Federal Rule of Civil

Procedure 23(b)(2) and 23(b)(3) on behalf of himself and the following Classes:

**Nationwide Class**

All persons residing in the United States who are current or former customers of Figure Lending or any Figure Lending affiliate, parent, or subsidiary, and had their PII compromised as a result of the Data Breach.

In addition, Plaintiff brings this action on behalf of the following proposed Ohio Subclass defined as follows:

**Ohio Subclass**

All persons residing in the State of Ohio who are current or former customers of Figure Lending or any Figure Lending affiliate, parent, or subsidiary, and had their PII compromised as a result of the Data Breach.

97. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

98. Plaintiff reserves the right to amend the definitions of the Class or add a subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

99. **Numerosity — Fed. R. Civ. P. 23(a)(1).** The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Upon information and belief, approximately 967,200 individuals were impacted by the Data Breach. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals, as evidenced by sending them breach notification letters.

100. **Commonality — Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely

individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members are the following:

a. Whether Defendant owed a duty to Plaintiff and Class Members to implement and maintain reasonable data security measures, and the sources of that duty, including the common law, the Gramm-Leach-Bliley Act, the FTC Safeguards Rule, and Defendant's own Privacy Policy representations;

b. Whether Defendant breached that duty by storing nearly one million consumers' Private Information unencrypted in an Internet-accessible environment, failing to implement adequate authentication controls, failing to secure its Okta single sign-on implementation against a known attack vector, and failing to train employees to recognize and resist social engineering attacks;

c. Whether Defendant's Privacy Policy, incorporated into its Terms of Service, constituted an express contract and whether Defendant breached it;

d. Whether Defendant was unjustly enriched by retaining the cost savings from its decision to forgo the security measures it was legally required and publicly represented to maintain;

e. Whether Defendant's breach notification was timely, complete, and accurate, including whether Defendant's omission of the ransom demand, the dark web publication, and ShinyHunters' public deadline violated its notification obligations;

f. Whether Defendant's misrepresentations regarding its data security practices, and its failure to disclose the inadequacy of those practices at the time Plaintiff and Ohio Subclass Members provided their Private Information, constituted unfair,

deceptive, or unconscionable acts or practices in violation of the Ohio Consumer Sales Practices Act, R.C. § 1345.01 et seq.; and

g. Whether Plaintiff and Class Members are entitled to damages, restitution, disgorgement, and injunctive relief as a result of Defendant's conduct.

101. **Typicality — Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

102. **Adequacy of Representation — Fed. R. Civ. P. 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflict of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members, and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

103. **Predominance and Superiority — Fed. R. Civ. P. 23(b)(3).** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant.

104. This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenges of these policies hinge on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

105. All members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

**COUNT I**
**NEGLIGENCE**
***On Behalf of Plaintiff and the Class***

106. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-105, as if fully set forth herein.

107. Defendant owed Plaintiff and Class Members a duty of reasonable care in safeguarding, securing, and protecting their Private Information. That duty arose from multiple independent sources, each sufficient standing alone to establish Defendant's obligation.

108. First, Defendant owed a common law duty of reasonable care arising from its voluntary collection and storage of highly sensitive personal and financial information belonging to Plaintiff and Class Members. Any entity that solicits, collects, and retains sensitive personal data, particularly data as sensitive as Social Security numbers, bank account credentials, biometric information, and government-issued identification, assumes a corresponding duty to exercise reasonable care in protecting that data from unauthorized access and disclosure.

109. Second, Defendant owed a duty of care arising from the special relationship between Defendant as a financial institution and lender and Plaintiff and Class Members as its borrowers. Plaintiff and Class Members did not voluntarily or casually entrust Defendant with their Private Information. They were required, as a mandatory precondition to obtaining Defendant's lending services, to provide Defendant with their most sensitive personal and financial data. That compelled entrustment, made in the context of a financial services relationship governed by federal law, created a special relationship giving rise to a duty of care independent of any contract between the parties.

110. Third, Defendant owed a duty of care as a financial institution subject to the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801, *et seq*., and the FTC's Standards for Safeguarding Customer Information, 16 C.F.R. Part 314 (the "Safeguards Rule"). These statutes and regulations impose specific, non-delegable, and mandatory obligations on entities in Defendant's position to develop, implement, and maintain a comprehensive written information security program containing administrative, technical, and physical safeguards appropriate to the nature and scope of their activities and the sensitivity of the customer information they maintain. Defendant's own Privacy Policy expressly acknowledged these obligations and directed consumers to its separate GLBA Privacy Notice, confirming that Defendant understood and publicly accepted its legal duties under federal law. These statutory and regulatory duties are independent of, and not contingent upon, any contractual relationship between the parties.

111. Fourth, Defendant owed a duty of care arising from its own affirmative representations. Prior to and through January 28, 2026, Defendant represented in its Privacy Policy that it used "reasonable precautions, including technical and administrative measures, to protect your Personal Data from loss, misuse, and unauthorized access, disclosure, alteration, or

destruction." Defendant further represented that one of the express purposes for which it maintained consumer PII was "to detect, prevent, and address fraud, criminal activity, or misuses of our Services and to ensure the security of our IT systems, architecture and networks." These representations were made to every consumer who provided PII to Defendant, including Plaintiff and Class Members, as a material inducement to entrust Defendant with their most sensitive personal and financial information. Having made those representations, Defendant had a duty to act consistently with them.

112. Defendant also had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits unfair acts or practices in or affecting commerce. The FTC has consistently interpreted and enforced Section 5 to require entities that collect and store consumer PII to implement reasonable data security measures, and has pursued enforcement actions against companies whose failure to do so caused the precise type of harm suffered by Plaintiff and Class Members here.

113. Defendant also had a duty to adequately train its personnel. The social engineering attack that compromised Defendant's systems was not an unforeseeable or novel attack vector. ShinyHunters' coordinated campaign targeting organizations that relied on the single sign-on provider Okta was publicly known in the cybersecurity community before January 28, 2026. Defendant, as a Nasdaq-listed financial institution storing the Private Information of nearly one million consumers and subject to the Safeguards Rule's specific employee training requirements, had both the means and the obligation to train its personnel to recognize and resist precisely this type of attack.

114. Defendant also had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach. That duty arose under the Safeguards Rule, 16 C.F.R. § 314.4(j),

which required Defendant to notify the FTC of the breach no later than thirty days after discovery, as well as under applicable state notification laws and the common law obligation to warn foreseeable victims of known harm. Defendant's breach notifications — sent beginning February 24, 2026, weeks after the stolen data had been published on criminal marketplaces, days after ShinyHunters' public deadline had already expired, and without disclosure of the ransom demand, the dark web publication, or the public deadline — did not satisfy this duty.

115. Defendant had full knowledge of the sensitivity of the Private Information it collected and stored, the regulatory obligations it assumed in collecting it, the threat environment facing organizations that relied on Okta for single sign-on authentication, and the types of harm that Plaintiff and Class Members would suffer if their Private Information were wrongfully disclosed. A data breach of the type that occurred here was not merely foreseeable — it was a known and publicly documented risk that Defendant was specifically on notice to guard against.

116. Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate data security practices. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of nearly one million consumers, the critical importance of providing adequate security for that information, and the necessity of implementing the safeguards that federal law specifically required it to maintain.

117. Defendant breached its duties by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

118. Defendant breached its duties by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information, including the specific measures required by 16 C.F.R. Part 314;

b. Storing the Private Information of nearly one million consumers unencrypted in an Internet-accessible environment, in direct violation of 16 C.F.R. § 314.4(c)(3) and Defendant's own Privacy Policy representations;

c. Failing to implement adequate multi-factor authentication controls sufficient to prevent a social engineering attack from granting unauthorized access to its systems, in violation of 16 C.F.R. § 314.4(c)(5);

d. Failing to adequately train employees to recognize and resist social engineering attacks of precisely the type ShinyHunters employed, in violation of 16 C.F.R. § 314.4(e)(1);

e. Failing to adequately secure its Okta single sign-on implementation against a known and publicly reported attack vector that had been used against other organizations in the same coordinated campaign;

f. Failing to implement adequate access controls to limit employee access to sensitive customer databases, in violation of 16 C.F.R. § 314.4(c)(1);

g. Failing to adequately monitor and log system activity to detect unauthorized access in real time, in violation of 16 C.F.R. § 314.4(c)(8), as evidenced by the fact that attackers conducted systematic, sustained database queries against Defendant's loan systems without detection;

h. Failing to adequately monitor threat intelligence regarding active

cybercriminal groups, including ShinyHunters, whose well-documented history of attacks against Okta-reliant organizations was publicly available before the Data Breach;

i. Failing to timely and adequately notify Plaintiff and Class Members of the Data Breach so they could take appropriate protective measures; and

j. Issuing breach notifications that deliberately omitted material facts.

119. But for Defendant's wrongful and negligent breach of the duties described herein, the Private Information of Plaintiff and Class Members would not have been compromised, stolen, and published on criminal marketplaces.

120. There is a direct and proximate causal connection between Defendant's failure to implement adequate data security measures and the harm suffered by Plaintiff and Class Members. The Data Breach was the foreseeable and direct result of Defendant's failure to implement the measures it was legally required, contractually obligated, and publicly represented to maintain.

121. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual and ongoing consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; (vii) anxiety, emotional distress, and loss of privacy; and (viii) a continuing and substantially increased risk of identity theft and financial fraud arising from Private Information that has already been published on criminal marketplaces, cannot be cancelled or reissued, and remains permanently available to bad actors for exploitation for years, and

potentially decades, to come.

122. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

123. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures consistent with the requirements of 16 C.F.R. Part 314 and applicable industry standards; (ii) submit to future periodic independent audits of those systems and procedures; and (iii) provide adequate credit monitoring and identity restoration services for a period commensurate with the lifetime risk posed by the categories of data compromised in the Data Breach.

**COUNT II**
**BREACH OF EXPRESS CONTRACT**
***On Behalf of Plaintiff and the Class***

124. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-105, as if fully set forth herein.

125. Defendant published and maintained a Privacy Policy on its website applicable to all PII collected from Plaintiff and Class Members. Defendant's General Terms of Service expressly incorporated the Privacy Policy by reference, listing it among the "Incorporated Agreements" that, together with the Terms, form a "legally binding agreement between Figure and you regarding your use of the Service." Plaintiff and Class Members were required to affirmatively accept the Terms of Service as a condition of accessing Defendant's services and providing their Private Information. That acceptance constitutes offer, acceptance, and mutual assent, transforming the Privacy Policy's security representations from unilateral statements into binding contractual obligations.

126. The express contracts formed between Defendant and Plaintiff and Class

Members are further distinguished by the timing and deliberateness of Defendant's representations. Defendant's Privacy Policy was last revised on October 24, 2025, just ninety days before the Data Breach. These were not stale boilerplate commitments; they were active, recently reaffirmed promises made to consumers whose data Defendant was storing at the time of the breach, and upon which Plaintiff and Class Members reasonably relied in entrusting Defendant with their most sensitive personal and financial information.

127. Under these express contracts, Defendant made the following specific, enforceable promises to Plaintiff and Class Members:

a. In its Privacy Policy, under a section titled "Security," Defendant expressly represented: "We use reasonable precautions, including technical and administrative measures, to protect your Personal Data from loss, misuse, and unauthorized access, disclosure, alteration, or destruction";

b. In its Privacy Policy, Defendant further represented that one of the express purposes for which it collected and maintained consumer PII was "to detect, prevent, and address fraud, criminal activity, or misuses of our Services and to ensure the security of our IT systems, architecture and networks"; and

c. In its Privacy Policy, Defendant represented: "We want to be clear that we do not sell your Personal Data to any other entities."

128. The breadth and sensitivity of the data Defendant required Plaintiff and Class Members to provide, including Social Security numbers, taxpayer identification numbers, government-issued identification documents, biometric information including facial geometry, bank account and routing numbers, financial institution login credentials, and income information, makes the security representations in subparagraph (a) above a material term of the

express contracts. Plaintiff and Class Members would not have provided Private Information of this sensitivity absent Defendant's express promise to protect it.

129. Plaintiff and Class Members fully performed their obligations under the express contracts by providing their Private Information to Defendant and agreeing to the Terms of Service.

130. Defendant breached the express contracts by:

a. Failing to use reasonable precautions, including technical and administrative measures, to protect Plaintiff's and Class Members' Private Information from loss, misuse, and unauthorized access, disclosure, alteration, or destruction, in direct contradiction of its express representation;

b. Storing Plaintiff's and Class Members' Private Information, including Social Security numbers, bank credentials, and biometric data, unencrypted in an Internet-accessible environment;

c. Failing to adequately train employees to recognize and resist social engineering attacks, despite expressly representing that it used reasonable administrative measures to protect consumer data;

d. Failing to implement adequate authentication controls, access controls, and system monitoring sufficient to detect and prevent the Data Breach, despite expressly representing that one of the purposes for maintaining consumer PII was to ensure the security of its own systems;

e. Allowing unauthorized third parties to access, exfiltrate, and publish Plaintiff's and Class Members' Private Information on criminal

marketplaces, resulting in the functional equivalent of the data sale Defendant expressly promised it would never make; and

f. Failing to promptly and accurately notify Plaintiff and Class Members of the Data Breach, omitting from its notices the material facts that a ransom had been demanded and refused, that the stolen data had already been published on the dark web, and that ShinyHunters had issued a public deadline six days before Defendant notified a single affected individual.

131. Defendant's breaches were a direct and proximate cause of the Data Breach and the resulting harm to Plaintiff and Class Members.

132. As a direct and proximate result of Defendant's breach of the express contracts, Plaintiff and Class Members have suffered damages including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with mitigating the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; (vii) anxiety, emotional distress, and loss of privacy; and (viii) a continuing and substantially increased risk of identity theft and financial fraud from Private Information that has already been published on criminal marketplaces, cannot be cancelled or reissued, and remains permanently available for exploitation.

133. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, and to injunctive relief requiring Defendant to implement and maintain reasonable data security measures, submit to periodic independent audits, and provide credit monitoring commensurate with the lifetime risk posed by the categories of data compromised.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### *On Behalf of Plaintiff and the Class*

134. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-105, as if fully set forth herein.

135. Plaintiff brings this Count in the alternative to Count II. To the extent the Court determines that no express contract exists between Defendant and Plaintiff and Class Members, Plaintiff alleges that the parties entered into implied contracts when Plaintiff and Class Members provided their Private Information to Defendant as a mandatory precondition to obtaining its lending services.

136. The implied contracts arose from the bilateral exchange at the core of the parties' relationship. Plaintiff and Class Members offered and granted access to their Private Information to Defendant for specific servicing and lending related purposes only—as a necessary precondition of accessing Defendant's services. They Private Information included Social Security numbers, bank account credentials, biometric information, and other uniquely sensitive categories of personal data. In exchange, Defendant provided lending services and assumed the obligation, reasonably implied from the circumstances, to implement and maintain adequate measures to protect the Private Information it compelled Plaintiff and Class Members to provide.

137. This implied obligation is not derived from Defendant's Privacy Policy standing alone. It arises from the nature of the transaction itself: a financial institution that requires consumers to surrender their most sensitive personal and financial data as the price of doing business cannot reasonably retain that data, profit from it, and disclaim any obligation to protect it. Plaintiff and Class Members would not have provided their Private Information to Defendant

absent a reasonable expectation that it would be safeguarded. That expectation was mutual, reasonable, and objectively apparent from the circumstances of the parties' relationship.

138. Pursuant to these implied contracts, Defendant was obligated to: (a) implement and maintain reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' Private Information; (b) use the Private Information collected only for legitimate business purposes; (c) prevent unauthorized access to and disclosure of that information; (d) promptly notify Plaintiff and Class Members of any unauthorized access to their Private Information; and (e) retain Private Information only for as long as necessary and dispose of it securely thereafter.

139. Plaintiff and Class Members fully performed their obligations under the implied contracts by providing their Private Information to Defendant in exchange for consideration of their loan applications and access to Defendant's lending services.

140. Defendant breached these implied contracts by failing to implement reasonable data security measures, storing Private Information unencrypted in an Internet-accessible environment, failing to adequately train employees against social engineering attacks, failing to secure its Okta single sign-on implementation against a known attack vector, and failing to promptly and accurately notify Plaintiff and Class Members that their Private Information had been compromised and published on criminal marketplaces.

141. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members have suffered damages including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with mitigating the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; and (vii) a continuing and substantially increased

risk of identity theft and financial fraud.

142. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages, and to injunctive relief requiring Defendant to implement and maintain reasonable data security measures, submit to periodic independent audits, and provide credit monitoring commensurate with the lifetime risk posed by the categories of data compromised.

**COUNT IV**
**UNJUST ENRICHMENT**
***On Behalf of Plaintiff and the Class***

143. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-105, as if fully set forth herein.

144. Plaintiff brings this Count in the alternative to Counts II and III. To the extent the Court determines that no express or implied contract governs the subject matter of this dispute, Plaintiff and Class Members are entitled to relief under the doctrine of unjust enrichment.

145. Plaintiff and Class Members conferred benefits upon Defendant in two respects. First, they provided Defendant with their Private Information — information that has independent economic value and that Defendant used to operate and profit from its lending business, securitize loan portfolios, and service its business-to-business partner relationships. Second, they paid fees, interest, and other consideration to Defendant in connection with their lending transactions. The prices Defendant charged for its services necessarily incorporated a premium for the data security obligations Defendant was legally required and publicly represented to maintain.

146. Defendant knowingly accepted and retained both benefits. It collected, stored, and actively used Plaintiff's and Class Members' Private Information for its own commercial purposes, and it accepted and retained the consideration Plaintiff and Class Members paid for

services that were represented to include reasonable data security protections.

147. Defendant was unjustly enriched in a specific and demonstrable way: it saved the costs it was legally obligated and contractually represented to spend on data security, including encryption of PII at rest, adequate multi-factor authentication, employee training against social engineering, and real-time system monitoring, and retained those savings as profit while simultaneously representing to Plaintiff and Class Members that those measures were in place. Defendant did not merely fail to deliver adequate security; it affirmatively represented that it was delivering security it had decided not to pay for. That is not a case where a defendant provided what was bargained for and an unforeseen harm resulted. It is a case where Defendant collected a premium for a protection it chose not to provide and pocketed the difference.

148. It would be unconscionable to permit Defendant to retain these benefits. Plaintiff and Class Members entrusted Defendant with their most sensitive personal and financial information in reliance on Defendant's representations that it was spending what was reasonably necessary to protect it from foreseeable threats. Had Plaintiff and Class Members known that Defendant was storing their Private Information unencrypted in an Internet-accessible environment, had failed to implement adequate authentication controls, and had failed to train its employees against the precise type of attack that ultimately occurred, they would not have entrusted Defendant with their Private Information or paid the consideration they paid.

149. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and Class Members are entitled to restitution, disgorgement of the profits and cost savings Defendant obtained through its wrongful conduct, and such other equitable relief as the Court deems appropriate, including the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

**COUNT V**
**INVASION OF PRIVACY — INTRUSION UPON SECLUSION**
***On Behalf of Plaintiff and the Class***

150. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-105, as if fully set forth herein.

151. Plaintiff and Class Members had a reasonable and objectively justified expectation of privacy in their Private Information, including their full names, Social Security numbers, dates of birth, home addresses, phone numbers, email addresses, loan account numbers, loan information, bank account credentials, and biometric data. That expectation was reasonable not only because of the inherently sensitive nature of this information, but because Defendant itself expressly promised to protect it as a condition of the parties' relationship.

152. Defendant intentionally and recklessly intruded upon that privacy interest by failing to implement adequate data security measures, thereby allowing ShinyHunters to gain unauthorized access to Defendant's systems, systematically extract the Private Information of nearly one million individuals, and publish that information on criminal marketplaces accessible to anyone who sought to exploit it. Defendant compounded that intrusion by remaining silent while the stolen data circulated on the dark web, denying Plaintiff and Class Members even the opportunity to respond to the invasion of their privacy on the same timeline as the general public.

153. The intrusion is not theoretical or contingent on future harm. Plaintiff Scott Hinton learned of the compromise of his Private Information not from Defendant, but from IDnotify, a third-party service, which alerted him that his Private Information had been identified on the dark web with figure.com listed as the source. That alert constitutes documented, concrete

evidence that Plaintiff's Private Information was published on criminal marketplaces and exposed to bad actors as a direct result of the Data Breach. Following that alert, Plaintiff experienced a marked and ongoing increase in unsolicited contacts identified by his phone carrier as potential fraud — a direct and foreseeable consequence of the publication of his Private Information on criminal markets where stolen contact data is routinely acquired and exploited.

154. The intrusion upon Plaintiff's and Class Members' seclusion would be highly offensive to a reasonable person. The Private Information compromised here is among the most sensitive categories of personal data in existence; data that cannot be cancelled, reissued, or otherwise neutralized once exposed, and whose compromise enables identity fraud that can persist for a lifetime. The publication of this data on criminal marketplaces, for anyone to access and exploit, represents a total and permanent loss of control over information that Plaintiff and Class Members provided to Defendant for the limited and specific purpose of obtaining a home equity line of credit.

155. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered damages including: (i) the actual, documented exposure of their Private Information to criminal actors; (ii) lost or diminished value of their Private Information; (iii) lost time and opportunity costs associated with mitigating the consequences of the Data Breach; (iv) anxiety, emotional distress, and loss of privacy; (v) a continuing and substantially increased risk of identity theft and financial fraud; and (vi) the permanent loss of control over uniquely sensitive personal information that cannot be recovered, cancelled, or rendered harmless.

156. Plaintiff and Class Members are entitled to compensatory, consequential, and

nominal damages, as well as injunctive relief, as a result of Defendant's invasion of their privacy.

## COUNT VI
## VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
## R.C. 1345.01, *et seq.*
***On Behalf of Plaintiff and the Ohio Subclass***

157. Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-105, as if fully set forth herein.

158. Defendant is a "supplier" as defined by R.C. 1345.01(C). Defendant is engaged in the business of effecting consumer transactions, including originating and servicing home equity lines of credit and other lending products to Ohio consumers.

159. Plaintiff and Ohio Subclass Members are "consumers" as defined by R.C. 1345.01(D), and their transactions with Defendant, including obtaining or applying for home equity lines of credit and other lending products and services, constitute "consumer transactions" as defined by R.C. 1345.01(A).

160. The OCSPA exemption under R.C. 1345.02(C) does not bar this claim. That exemption applies only where the specific act or practice challenged is specifically authorized or affirmatively permitted by federal or state law. The acts and practices challenged here — including Defendant's misrepresentations regarding its data security measures, its failure to implement adequate security, and its failure to provide timely and accurate breach notification — are not authorized by the Gramm-Leach-Bliley Act, the FTC Safeguards Rule, or any other federal or state law. To the contrary, they violate those laws. A federal statute that imposes mandatory data security obligations on a regulated entity does not thereby authorize that entity's violations of those obligations. The existence of a federal regulatory scheme governing data security does not preempt an Ohio consumer protection claim premised on conduct that the federal scheme itself prohibits.

161. The OCSPA, R.C. 1345.02, prohibits suppliers from committing unfair or deceptive acts or practices in connection with a consumer transaction, including acts or practices that represent that the subject of a consumer transaction has characteristics, uses, benefits, or qualities that it does not have, and acts or practices that represent that the subject of a consumer transaction is of a particular standard, quality, or grade when it is of another.

162. Defendant engaged in unfair and deceptive acts and practices in violation of the OCSPA, including, but not limited to:

a. Representing through its Privacy Policy that it used "reasonable precautions, including technical and administrative measures, to protect your Personal Data from loss, misuse, and unauthorized access, disclosure, alteration, or destruction," when in fact Defendant was storing Private Information unencrypted in an Internet-accessible environment with inadequate authentication controls, undertrained employees, and insufficient system monitoring;

b. Representing in its Privacy Policy that one of the express purposes for which it maintained consumer PII was to detect, prevent, and address fraud and to ensure the security of its own systems, when in fact Defendant had failed to implement the security measures necessary to fulfill that representation;

c. Failing to disclose material facts regarding the inadequacy of its data security practices, including its failure to encrypt PII at rest, its failure to implement adequate authentication controls, its failure to adequately train employees against social engineering attacks, and its reliance on a single

sign-on implementation it had failed to adequately secure, at the time Plaintiff and Ohio Subclass Members provided their Private Information to Defendant;

d. Collecting and storing Plaintiff's and Ohio Subclass Members' Private Information, including Social Security numbers, bank credentials, and biometric data, unencrypted in an Internet-accessible environment without disclosing that its data security practices were inadequate to safeguard information of that sensitivity;

e. Failing to timely notify Plaintiff and Ohio Subclass Members of the Data Breach, waiting until February 24, 2026, to begin a notification process that itself failed to reach all affected individuals, including Plaintiff; and

f. Issuing breach notifications that omitted material facts Plaintiff and Ohio Subclass Members needed to protect themselves, thereby denying Plaintiff and Ohio Subclass Members the opportunity to respond to the threat on the same timeline available to the general public.

163. The OCSPA, R.C. 1345.03, further prohibits suppliers from committing unconscionable acts or practices in connection with a consumer transaction. Defendant engaged in unconscionable acts and practices by knowingly taking advantage of Plaintiff's and Ohio Subclass Members' inability to protect their own interests. Once Plaintiff and Ohio Subclass Members provided their Private Information to Defendant, they had no ability to independently assess, monitor, or protect that information. Defendant exclusively controlled the systems on which it was stored, the security measures applied to it, and the information Plaintiff and Ohio Subclass Members received about its safety. Defendant exploited that asymmetry by maintaining

materially inadequate security while representing to consumers that reasonable protections were in place.

164. Defendant knew or should have known that its conduct violated the OCSPA. Defendant operated in a heavily regulated industry, was subject to specific federal data security obligations it publicly acknowledged, had recently revised its Privacy Policy to reaffirm its security representations ninety days before the breach, and was on notice of the threat posed by the ShinyHunters campaign targeting Okta-reliant organizations before the Data Breach occurred. Defendant's violations were not the product of ignorance, they were the predictable result of a deliberate decision to forgo legally required security measures while continuing to represent to consumers that those measures were in place.

165. As a direct and proximate result of Defendant's violations of the OCSPA, Plaintiff and Ohio Subclass Members have suffered ascertainable losses and damages including: (i) loss of the benefit of their bargain; (ii) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and fraud; (iii) the value of time spent mitigating the consequences of the Data Breach; (iv) diminished value of their Private Information; (v) loss of privacy; and (vi) anxiety and emotional distress.

166. Pursuant to R.C. 1345.09, Plaintiff and Ohio Subclass Members are entitled to recover their actual damages and an order enjoining Defendant's unfair, deceptive, and unconscionable practices. Because Defendant's violations were committed knowingly, Plaintiff and Ohio Subclass Members are further entitled to recover treble damages, plus reasonable attorneys' fees pursuant to R.C. 1345.09(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Scott Hinton, individually and on behalf of all others similarly

situated, respectfully requests that this Court:

A. Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23, certifying both the Nationwide Class and the Ohio Subclass as defined herein;

B. Appoint Plaintiff as Class Representative and appoint his counsel as Class Counsel;

C. Award appropriate compensatory and nominal damages to Plaintiff and all Class Members on Counts I, II, III, and V;

D. Award restitution and disgorgement of all profits and cost savings Defendant obtained through its failure to implement the data security measures it was legally obligated and publicly represented to maintain, on behalf of Plaintiff and all Class Members pursuant to Count IV (Unjust Enrichment), and establish a constructive trust from which such restitution or compensation may be paid;

E. Award treble damages and reasonable attorneys' fees to Plaintiff and the Ohio Subclass pursuant to Ohio Rev. Code 1345.09, based on Defendant's knowing violations of the Ohio Consumer Sales Practices Act as alleged in Count VI (OCSPA);

F. Enter declaratory relief establishing that Defendant's data security practices, as described herein, violated its duties under the common law, the Gramm-Leach-Bliley Act, the FTC Safeguards Rule, and its own contractual representations to Plaintiff and Class Members;

G. Order appropriate injunctive and equitable relief under applicable law, including but not limited to:

i. Requiring Defendant to implement and maintain a comprehensive

Information Security Program, consistent with the requirements of 16 C.F.R. Part 314 and applicable industry standards, designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

ii. Requiring Defendant to encrypt all PII stored on its systems, in compliance with 16 C.F.R. § 314.4(c)(3);

iii. Requiring Defendant to implement and maintain adequate multi-factor authentication controls sufficient to prevent unauthorized access through social engineering attacks, in compliance with 16 C.F.R. § 314.4(c)(5);

iv. Requiring Defendant to implement and maintain adequate access controls limiting employee access to sensitive customer databases to only that which is necessary to perform assigned duties, in compliance with 16 C.F.R. § 314.4(c)(1);

v. Requiring Defendant to implement and maintain adequate monitoring and logging of system activity sufficient to detect unauthorized access in real time, in compliance with 16 C.F.R. § 314.4(c)(8);

vi. Requiring Defendant to develop, implement, and maintain a security awareness training program for all appropriate personnel, including training specifically addressing social engineering attacks and the risks posed by single sign-on providers, in compliance with 16 C.F.R. § 314.4(e)(1);

vii. Requiring Defendant to engage independent third-party security auditors to conduct periodic testing, including simulated attacks, penetration tests, and vulnerability assessments, at intervals consistent with the

requirements of 16 C.F.R. § 314.4(d) and applicable industry standards;

viii. Requiring Defendant to segment its network through firewalls and access controls so that a compromise of one area of its systems cannot provide access to other portions;

ix. Requiring Defendant to develop and maintain a written incident response plan consistent with 16 C.F.R. § 314.4(h), including protocols for timely, complete, and accurate notification of affected individuals that discloses all material facts necessary for those individuals to assess and respond to the threat; and

x. Requiring Defendant to provide credit monitoring and identity restoration services to Plaintiff and Class Members for a period commensurate with the lifetime risk posed by the categories of data compromised in the Data Breach and not limited to the two-year period Defendant has offered;

H. Award Plaintiff and the Class pre-judgment and post-judgment interest as prescribed by law;

I. Award reasonable attorneys' fees and litigation costs as permitted by law; and

J. Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff Scott Hinton hereby demands a trial by jury on all claims so triable.

Respectfully Submitted,

/s/ Brian D. Flick
Brian D Flick (OH 0081605)
Marita I. Ramirez (0101882)
Marc E. Dann (OH 0039425)
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107

Phone: (216) 373-0539
Facsimile: (216) 373-0536
*notices@dannlaw.com*

Thomas A. Zimmerman, Jr.*
**Zimmerman Law Offices, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
*firm@attorneyzim.com*

**Pro Hac Vice* Motion to be submitted

*Counsel for Plaintiff Scott Hinton and the Proposed Class and Subclass*